McGuffie *vs*. The State.

No. 86.—ZEPHENIAH McGUFFIE, plaintiff in error, *vs*. THE STATE OF GEORGIA, defendant.

[1.] A decision of the Court in a criminal cause, in which the indictment is afterwards *quashed*, cannot be excepted to as erroneous, in a case tried upon a subsequent indictment for the same offence.

[2.] It is not necessary to the organization or continuance of the Superior or Inferior Courts, that the High Sheriff should be present—his attendance may be by deputy.

[3.] A Deputy Sheriff may appoint a bailiff to do a particular act, though he cannot appoint a Bailiff to do the general business of his office.

[4.] It is within the discretion of the Court to determine the number of which the panel of *tales* Jurors shall consist in capital cases, and the number of panels which may be at the same time summoned.

[5.] It is not necessary that the names of *tales* Jurors should be in the Jury box, or that they should be qualified to serve as Jurors at any time before trial. It is sufficient, if at that time, they have the legal qualifications of Jurors.

[6.] If several Jurors be sworn when another is challenged, the Court may assign any two of those sworn to try the challenge.

[7.] It is unnecessary to consider the merits of an objection to Jurors overruled by the Court, if, upon other grounds, the Jurors are passed for cause.

[8.] An objection, that the indorsement and return of "true bill" upon an indictment was not signed by one of the Jury *as foreman: Held,* to have been rightly over-ruled, especially as the same was made after trial and verdict.

[9.] A verdict to the following effect: "We, the Jury find, from the evidence produced, that the prisoner is guilty of murder," is not a special, but is a general verdict of guilty.

[10.] When, in the formation of a Jury in a criminal cause, one Juror has been sworn and another is challenged, the Juror sworn should be joined with two triors selected by the Court to try the challenge.

[11.] A Juror who has heard any portion of the testimony in a criminal cause, upon oath, before the trial, and who states that he has formed and expressed a decided opinion in relation to the prisoner's guilt, is an incompetent Juror ; although, upon this being discovered after trial, and a mot on for new trial is based thereon, he may swear that "he was influenced in his verdict, alone, by the evidence adduced before him, and the charge of the Court."

[12.] The Jury are judges of the law in criminal cases, in this : that they have the legal right to acquit the prisoner, although the Judge may charge them, that if certain facts be proven, he is guilty according to law ; and although they may find those facts to be proven. But the Judge is their safe and reliable adviser as to the law.

[13.] A charge is defective which precludes the Jury from giving due weight and consideration to any material circumstance, the effect of which, in their minds, might have been to reduce the crime from murder to voluntary manslaughter.

Indictment for murder, in Floyd Superior Court. Tried before Judge JOHN H. LUMPKIN, May Term, 1854.

This was an indictment for the murder of John H. Wallace

McGuffie *vs.* The State.

A former bill for the same offence was quashed and a new one found. The following points were made on the trial: when the fourth panel of forty-eight tales Jurors was put upon the prisoner, his Counsel objected to the array on the following grounds:

1st. That the High Sheriff was absent from Court and the Court could not legally be held without him.

2d. That two panels had been summoned together.

3d. That after one panel of forty-eight, every subsequent panel should consist of a less number.

4th. That the panel had been summoned by persons, some of them Bailiffs, and one a private citizen, whose only authority to act was the order of the Deputy Sheriff. These objections were all over-ruled by the Court, and the defendant excepts. (The above panel were all set aside for cause.)

Joseph Waters and John Rogers having been appointed by the Court as triors, and one Juror having been sworn in chief, the Court directed one J. W. George, a Juror challenged by the defendant, to be tried by the same triors, without joining to them the Jurymen who had been sworn in chief, the prisoner making at the time no objection, and this is assigned as error.

After two Jurymen, to-wit: Thomas and Andrews, had been sworn in chief, they were directed to act as triors, and acted as such through the impannelling of the Jury, without joining to them the other Juryman as they were sworn; and this is alleged as error. A Juror named Russell was objected to by defendant, because he was not a resident of the county at the last revision of the Jury box, so that his name was not in the box; and another named Morris, because he was not of age at the last election for members of the Legislature.

The objections were over-ruled, and the defendant excepts.

When panel No. 9 was put on the prisoner, it was objected to because twenty-four of the number were the regular panel for the second week of the Court, and had been summoned before the trial commenced; because some of them had already been put on the prisoner in other panels; and also, that many of them had been summoned on Sunday.

All which objections the Court over-ruled, which is alleged as error.    All these Jurors were set aside for cause.

The Jury being impannelled, the following testimony was introduced in the cause:

A. S. Lorring, sworn by the State, says: that on July 18th, 1852, in this, Floyd County, the killing of John H. Wallace by the prisoner accused, he, witness and Mr. Jones were in co-partnership in making brick; they had two yards in one enclosure, and in the evening of the 18th day of July, Zepheniah McGuffie, the prisoner, came to witness to borrow a wheel-barrow to carry some boards to cover a house inside one of the yards, for Mr. Jones.    Witness loaned prisoner the wheel-barrow, and the next thing he saw was deceased and prisoner pulling at the wheel-barrow.    Deceased pulled prisoner and wheel-barrow both in the direction of the Mr. Jones' brick-yard.    Deceased was attending to the brick-yard for Mr. Jones; was an overseer in the yard where there were about half dozen hands at work; deceased pulled prisoner and the wheel-barrow to where the brick were.    Prisoner said to witness, do you allow this damned rascal to have the wheel-barrow?    Prisoner then gathered up a stone and followed deceased on to the yard, swearing as he, prisoner, went, that he would use that stone on deceased; the next thing I saw, deceased was loading his wheel-barrow with brick; prisoner went up to where deceased was, and turned the wheel-barrow over; then deceased caught prisoner, took him by the collar, shook him (prisoner) until his hat dropped off, and said to prisoner, go away and let me alone; but deceased did not strike prisoner; prisoner then put on his hat and started off in the direction of Mr. Walker's; thinks prisoner boarded with Mr. Walker; from the brick-yard to where Walker lives, it was between one-half and three-quarters of a mile; the next thing he saw of prisoner he was coming back to the brick-yard with a gun; was gone between half and three-quarters of an hour; prisoner had a double-barrel shot gun, worth about ten or twelve dollars.    Prisoner walked into the yard and said to deceased, now God damn you, leave here or I will kill you, and raised his gun to his (prisoner's) face; de-

ceased was engaged, with others, at the time, packing brick; and he said boys, go and take the gun away from him; some of the boys said, Mr. McGuffie, don't shoot here; then prisoner took the gun down from his face; prisoner was twenty or thirty yards from deceased; deceased said to prisoner, if you raise that gun again I will throw a brick-bat at you; prisoner raised his gun again, and deceased threw the brick-bat at him, and then deceased jumped over the brick-hack; where he jumped over it was between three and four feet high; when prisoner first put the gun to his face, deceased was standing in the crowd; when deceased threw the brick-bat at prisoner, he jumped over the hack and was in the act of picking up another brick, when prisoner walked round the end of the hack, fifteen or twenty feet and shot him in the lower part of the abdomen with a load from one barrel of the shot gun; the other barrel was cocked; when the gun fired deceased fell; prisoner then passed across the yard to where witness was, a distance of some seventy-five yards, and said, God damn him I have shot him too low; I intended to shoot him through his God damned heart, and he is not the first man I have shot; prisoner came over into the yard where the witness had charge of, and commenced loading the barrel he had just shot; witness then went over to see if deceased was dead; he found him lying on his belly, under the sill of the house Mr. Jones was building; deceased asked witness for water, which he gave him; while there the prisoner came then in fifteen or twenty steps of where they were and asked if he was dead; deceased replied he was not, and that if it was God's will he hoped he would not die; prisoner said God damn you, don't give me any of your sauce, or I will give you another charge; while loading his (prisoner's) gun in the yard, he boasted a good deal and said none of the McGuffie's had ever been run over and he would be God damned if he should; there was a fence between where prisoner was standing and where deceased was lying; the fence was made of plank upright, with two inches of space between them; deceased was lying where he could see prisoner, and when prisoner said God damn you, don't give

me any of your sauce or I will give you another charge, he took the gun down from his shoulder and put it to his face. Deceased was twenty or thirty yards, when shot, from where the sill was, under which he was afterwards lying, and prisoner tried to go about one hundred yards from where he was loading his gun to the house where deceased was lying; deceased had as much control over the wheel-barrow as witness did; deceased lived four days after he was shot, when he died; witness saw deceased in the time he was confined; was present when he died; witness thinks died from the wounds.

Cross-examined—The enclosure contained about two acres; there was a fence all around; there were two brick-yards within their enclosure; witness and Mr. Jones were in co-partnership in one yard, the other belonged to Mr. Jones, and deceased controlled the hands of Mr. Jones' yard, and witness those of the other; Mr. Jones was having a house built. Mr. McGuffie was in the employ of Mr. Jones. Witness was at work in one yard, deceased in the other, prisoner on the house; the wheel-barrow belonged to Mr. Jones, but the understanding between Mr. Jones and witness was, that the wheel-barrow was as much for one as the other, while they were together; from the time that witness let the prisoner have the wheel-barrow, it was between one hour and a half, before he saw them scuffling; witness says that prisoner asked him if he allowed the damned rascal to have the wheel-barrow, and to the best of his recollection so stated it before; witness says the reason why he did not reply to prisoner was, that he knew deceased had as much control over the wheel-barrow as witness did; there was considerable difference in the size of deceased and prisoner; deceased was considerably larger than prisoner; when deceased took the wheel-barrow, prisoner took up a rock and followed deceased : but there was nothing to prevent his throwing the rock. Mr. Jones was not at the yard at the time; prisoner made no resistance when deceased shook him; witness says deceased did not throw but one brick and thinks he did not say in the former trial that deceased threw more than one brick; witness says there was no difficulty between he and

prisoner that he knew of; prisoner accused him of taking his boat, for which witness paid prisoner; witness had some one's boat, but don't know whether it was his or not.

Samuel Stewart, sworn, says: Prisoner came to him and gave himself up; witness asked him what it was for; prisoner replied, he had shot deceased—had shot him too low—had intended to shoot him through the heart—said take me and hang me or do what you please with me; this was all he (prisoner) said at the time.

Samuel Johnston, sworn, says: He was going down to where the difficulty had happened, and met prisoner, perhaps in the custody of Mr. Wimpee; witness asked prisoner if he was the one who had shot deceased; his reply was, that he was the one; witness then asked if he thought he had killed him; prisoner said no, he thought not—said he intended to shoot him in the heart, but that he was a little frightened, and that deceased was in the act of throwing at him at the time and let the gun fall a little and shot; he thought he shot too low; witness had been acquainted with deceased for some time previous to the difficulty.

Cross-examined: Witness said he understood from the prisoner that the difficulty was about a wheel-barrow, but don't remember what he said about it; said also to witness that none of the McGuffies had ever proved cowards, and that he would not be the first to disgrace the family; said also to witness that he went home after his gun and thinks he (prisoner) said he loaded it, but is not certain.

William B. Jones, sworn, says: He (witness) owned the brick-yard; says there were two yards in the same enclosure; his (witness') own hands worked in one yard; and that he was in co-partnership with Mr. Lorring and Beesley in the other; deceased had control of the yard which he (witness) owned; deceased had about as much control over the wheel-barrow as Lorring; whichever needed the wheel-barrow the most he considered he had the best right to it; deceased's name was John H. Wallace, and that prisoner's name is Zepheniah McGuffie; prisoner had about five hundred shingles wheeled up to the

house—a sufficient amount to have kept him employed the balance of the day.

Cross-examined: Witness says he had prisoner; was at work for him; prisoner had been sick a few weeks before the difficulty happened; he was quite sick; witness sat up with prisoner when sick; deceased may have been at work while prisoner was sick; he (deceased) had been employed but a short time in the yard; prisoner's chest of tools was left at witness' house after the difficulty happened; don't remember when they were carried there; prisoner went to work as soon as he was able after his illness; prisoner may have grown a little taller since the difficulty, but don't think he is any heavier; witness generally had some white man to take charge of the hands in the yard; don't know whether prisoner knew deceased had control of the hands at the time of the difficulty or not.

Thomas J. Word, sworn, says: He is a practicing physician; went to see deceased; found him very sick, lying on his bed, with many shots in his belly, ranging from his navel down; witness, with Dr. Smith, made a *post mortem* examination after his death and found that as many as four shots had entered his intestines, had produced inflammation and destructive mortification, and in his opinion produced deceased's death; witness got out only two shot.

Cross-examined: Says the shot extracted looked like they were small sized squirrel shot; looked like he (deceased) had been shot with some larger than those examined; says deceased lived four days after being shot.

Counsel for the State asked the following charges, which were given by the Court: That the sworn duty and the only duty of the Jury, is to determine the issue made upon the bill of indictment; that they were not to consider the consequences of their verdict, and that their conscientious scruples upon the subject of capital punishment, has nothing to do with their verdict; that words and opprobrious language do not and, in law, cannot justify an assault.

The Court, after having said that he could give all asked in charge as the law, either by prisoner's Counsel or the State's

Counsel, when he read over this charge in the words request-ed, believing the language used inapplicable to any state of facts proved, according to the 3d section of the 4th division of the Penal Code; and then read from the Penal Code as fol-lows, and charged it to be the law as applicable to the point: that provocation by words, threats, menaces or contemptuous gestures, shall in no case be sufficient to free the prisoner kill-ing from the guilt and crime of murder. That if the prisoner raised and pointed his loaded gun at the deceased, within a distance which the gun would carry, this act was an assault, and the deceased was justified in making resistance; that if the prisoner presented a loaded gun at the deceased, within a distance that the gun would carry, deceased was justified in throwing a brick-bat at prisoner; and that the throwing of the brick-bat cannot be urged as any mitigation of the prisoner's conduct, in continuing the difficulty in such a case. If the prisoner presented a loaded gun, with an evil intention, and the deceased threw a brick-bat at him, and then the prisoner shot him, it is murder. Such a case shows that the prisoner began the difficulty, and that the deceased did no illegal act in throwing the brick-bat.

This charge was given by the Court with this qualification, expressed at the time: that provided it was done with malice aforethought, the crime would amount to murder. Counsel for the defendant, amongst other things, asked the Court to charge the Jury, that the Jury are the judges in criminal ca-ses, both of the law and the facts, and have the legal right, both to construe the law and apply the facts—which charge the Court gave with this qualification: "the law as given you in charge by the Court." To the whole of which charge, thus given, Counsel for the prisoner then and there excepted, and here in this Court excepts. After the rendition of the verdict, which is as follows:

"We, the Jury, find from the evidence produced, that the

prisoner, Zepheniah McGuffie, is guilty of the murder of John H. Wallace.     JOHN L. NIX, Foreman of the Jury."

After the rendition of the verdict, defendant's Counsel moved in arrest of judgment on two grounds—

1st. That the bill of indictment does not show that any one was foreman of the Grand Jury that found it.

2d. That the verdict is not a general verdict; and therefore, illegal.

The motion was over-ruled by the Court, and this is assigned as error.

Prisoner's Counsel then moved for a new trial, alleging as errors the various rulings of the Court before mentioned; and also, on the ground of newly discovered testimony, going to contradict one Lorring, a witness for the State; and also, that R. R. Bunce, one of the Jury, had heard the testimony on a former trial of this case, and had, before the trial, expressed a decided opinion of the guilt of the prisoner, which fact was unknown to the prisoner until since the trial.

With this motion sundry affidavits were filed; those touching the witness, Lorring, are not necessary to be inserted. The following were filed, as to the Juror:

GEORGIA—FLOYD COUNTY:

The State *vs.* Zepheniah McGuffie.   Indictment for murder in Floyd Superior Court.   In open Court, May Term, 1854, came Zepheniah McGuffie, and being sworn, says—that he did not know that Rufus R. Bunce, one of the Jurors who tried the above case at this term of the Court, had formed and expressed his opinion against this deponent until since the trial and rendition of the verdict, and had he so known, he would not have consented to take him, the said Bunce, on the said Jury; and says further—that since the trial aforesaid, he has discovered evidence—new evidence—by which he expects to contradict the witness, Andrew J. Lorring, who testified against him—which evidence is set forth in the affidavit hereto annexed, and was unknown to this deponent until since the said

trial; and this deponent did not, until since the trial, know of any evidence to contradict the said witness, Andrew J. Lorring.   Sworn to before me in open Court, June 1st, 1854.

A. B. Ross, Cl'k S. C.                      Z. McGUFFIE.

The following is the statement of the Juror:

Rufus R. Bunce, sworn, says: That he was present at the first trial, and heard the testimony given in to the Jury on the trial; that he had an opinion as to the guilt or innocence of the prisoner at the bar, but his opinion, although formed, he thought was not so fixed and decided as could not be changed by the evidence more full and satisfactory; he had formed the opinion that the prisoner was guilty; when asked whether the opinion was decided, he answered that it was a decided opinion; he further swears that he was influenced as a Juror in his verdict alone by the evidence adduced before him as a Juror and the charge of the Court; says that he had not expressed the opinion to the prisoner and his Counsel before the last trial, but expressed it in part since; he thinks that he had expressed the opinion to others before the trial.   Sworn to in open Court and signed,                      RUFUS R. BUNCE.

A. B. Ross, Clerk.

By the affidavit of L. P. Walker, it appeared that he heard Rufus R. Bunce, since the trial at the present term, say, that he was present at the former trial of this case and heard all the evidence, and has, from that time, made up and formed a decided opinion as to the guilt of the prisoner, and had expressed it, as he thought.

The motion for a new trial was over-ruled; on which decision as well as the other decisions and charges excepted to, error is assigned.

J. W. H. UNDERWOOD, for plaintiff in error.

C. H. SMITH and Sol. Gen. WORD, for The State.

*By the Court.*—STARNES, J. delivering the opinion.

[1.] It is first alleged that the Court committed error in directing the Deputy Sheriff to summon certain persons as *tales* Jurors, who, at the time, were leaving or about to leave the Court room.

The indictment under which this proceeding took place, was subsequently quashed, and a new bill was returned, on which the trial proceeded, which we have now under consideration. The point made, therefore, has nothing to do with this case, and should not have encumbered the record.

[2.] The Court did not err in refusing to quash the fourth panel of Jurors summoned, because the High Sheriff was not in attendance on Court.

Our Judiciary Act, in declaring that " the Sheriffs of the several counties shall attend the Superior and Inferior Courts in the respective counties," &c. is simply directory to the Sheriff. It was not intended that his presence should be *necessary* to the organization and continuance of the Court.    Besides, it may be correctly said, that attendance by duly qualified deputy, in legal contemplation, is attendance by the Sheriff.

[3.] The Court below was also right in refusing to dismiss this panel, on the ground that the Jury had not been summoned according to law—a portion of the panel having been summoned by Jesse P. Ayer and others, who were acting as Bailiffs.

It appears by the record, that these persons had been appointed Bailiffs by the under Sheriff, for the purpose of executing this particular duty.    This was lawful.    An under Sheriff may constitute a Bailiff for the purpose of doing a particular act ; though he cannot appoint a deputy to do the general business of the office.    (*Leak vs. Howell, Cro. Eliz.* 533. *Parker vs. Kett,* 1 *Lord R.* 658.    12 *Mod.* 467.    1 *Salk.* 95. *Hunt vs. Burrell et al.* 5 *John.* 138.)

[4.] The several panels put upon the prisoner consisted of forty-eight Jurors; and it was objected, after verdict, that af-

·ter the first panel had been summoned, each successive panel should have consisted of a less number.

The regulation of this matter at Common Law, in capital ·cases, frequently seems to have depended very much upon the exigencies of the trial, and was within the discretion of the Court. (10 *Co.* 105, *a.* 8 *Bac. Abr. Tit. Juries, C. State vs. Lamon,* 1 *Hawk.* 175.) Our Statute of 1799 declaring, as it does, that " when, from challenge or otherwise, there shall not be sufficient number of Jurors to determine any civil or criminal case, the Court may order the Sheriff or his Deputy to summon by-standers or others, sufficient to complete the panel," &c. in effect, places this regulation within the discretion of the Court, if it were not so before. The panel which is thus directed to be made complete, is of course the panel of twelve who are to try the case ; for the language employed pre-supposes that the other panel is exhausted " by challenge or otherwise." The authority, then, which is given for the purpose of making this panel complete, is general, and not restricted, by any Common Law practice, as to the number of which the successive panels should consist. For convenience sake, perhaps, it may be more judicious to pursue the old practice in some cases. But the matter may be safely left where, we think, the law places it, viz: with the sound discretion of the presiding Judge.

[5.] In this case, one E. W. Russell was challenged by the prisoner, (when presented as a Juror,) on the ground that his name was not in the Jury box at the time of its last revision, though he had been six months in the county before the trial, and was otherwise a competent Juror.

Objection was made, too, to Sion Morris, on the ground that he was not of age at the period of the last general election, though of full age at the time of trial.

It is our opinion that the law does not require that the names of *tales* Jurors should be in the Jury box, or that they should have had the qualifications of Jurors at any time previous to the trial. It is sufficient, if they have the legal qualifications ·of Jurors at that time. There are several reasons for this view

of the subject; but we cannot dwell on them, as there is so much of this case, and so many more important points for our consideration.

[6.] It is insisted that when Daniel F. Sawyer was challenged as a Juror, and put upon triors, the Court erred in allowing him to be tried by two only of the Jury, several others having been before that time sworn.

The practice pursued by the Court was known to the Common Law, and is pursued generally by the Courts of our State. " If six" (Jurors) " be sworn and the rest challenged, the Court may assign any two of the six sworn to try the callenges." (2 *Hal. Hist. P. C.* 275. 1 *Ch. Cr. L.* 549. 8 *Bac. Abr. Ar. Juries, E.* 12.) For obvious reasons, this is a better practice than to require all who are sworn to try each challenge.

[7.] Objection was also made, that one of the panels of *tales* Jurors was summoned on Sunday. But it appears by the record, that every one of the Jurors thus summoned, was challenged and passed for other cause. It is unnecessary for us to give any opinion upon this objection.

So too, it was objected, that a Grand Juror who was upon the Jury which returned the first bill against the prisoner was summoned upon one of the panels of the Petit Jury. But it appears, that he too was passed for other cause, and no injury resulted to the prisoner.

Fuqua Beasly and William Ellison had been summoned on a previous panel of *tales* Jurors, and were again returned upon another panel and put upon the prisoner; and this, too, was objected to as error. These Jurors were likewise passed for cause ; and it is unnecessary for us to say any thing in relation to the point made.

[8.] Error was also assigned upon the refusal of the Court to arrest the judgment, because the return and endorsement of " true bill" upon the indictment was not signed by any one, *as foreman* of the Grand Jury.

Upon this point we remark, first, that it has been held, that there is no positive law requiring that the foreman of the Grand

Jury should sign the finding at all. This seems not to have been required at Common Law. And so it has been decided in South Carolina. *Creighton vs. Bell*, (1 *Nott & McC.* 256.) Our Statutes make no change in this respect. Though, as the Court say, in the case just cited, we think the practice usually adopted is advisable:

In the next place, we observe, that this return seems to have been signed by a Juror; but he did not sign as foreman. It could easily have been made certain by the minutes of the Court, however, we suppose, that he was foreman of the Jury; and if so, this might have been done; for in such case, *that is certain which may be made certain.*

Lastly, this is an exception which goes rather to the form than to the merits of the proceeding, and should have been taken before trial, according to the provisions of our code.

[9.] A verdict, such as that before us, is not a special verdict. It is, in effect, a general verdict of guilty. A special verdict is rendered when the Jury find certain facts to exist, and leave the Court to determine whether or not, according to the law which controls these facts, the prisoner is guilty. But here, the Jury find the prisoner guilty.

[10.] During the progress of this case, and after Wm. H. Thomas, one of the Jurors sworn in chief had been accepted and qualified, Joseph W. George was challenged by the prisoner, and the Court directed him to be put upon Joseph Walters and John Rogers as triors, they being by-standers and not having been sworn of the Jury, without joining the Juror Thomas with them. This course is not sanctioned by what appears to be a well settled practice, and the Court below erred therein.

If the challenge "be made to the first Juror, and of course before any one is sworn, then the Court will direct two indifferent persons to try the question; and if they find the party challenged indifferent, he will be sworn and join with the triors in determining the next challenge. But when two Jurors have been found impartial and have been sworn, then the office

of the triors will cease, &c. (1 *Ch. Cr. L.* 549. *Co. Litt.* 158. 8 *Bac. Abr. Juries, E.* 12. *Williams, J. Juries, V.*)

[11.] The Court also erred in refusing to grant a new trial on account of the expression of opinion by Rufus R. Bunce, one of the Jurors who had tried the prisoner.

This Juror had heard a portion of the testimony as it was delivered at the first trial. He had subsequently expressed the opinion to several persons, that the prisoner was guilty. And in his statement vindicating himself, he said that he had formed a decided opinion. He was thus disqualified by the express provisions of our law.

We have never decided that a Juror so disqualified might show himself competent by swearing, that notwithstanding such expression of opinion, &c. he felt that he was able to render a fair and impartial verdict, or that he had rendered such verdict. And especially did we not so decide in the case of *John Anderson vs. The State,* (14 *Ga.* 709.) That case, and all others should be considered *secundem subjectam materiam.* There the Juror had expressed an opinion from rumor. And we held that the effect of his affidavit was to show, that the opinion formed and expressed by him under these circumstances, was not a fixed opinion; that it may have yielded and did give way, probably, to the force of the testimony when heard by him upon oath, and that he was therefore a competent Juror, and would so have been pronounced if he had been challenged on this account when first called up, and had been put upon triors.

[12.] When instructing the Jury in this case his Honor, the Judge, was requested to charge, that in criminal cases the Jury "are judges, both of the law and the facts, and have the legal right, both to construe the law and apply the facts;" which charge was given, but the Court added, "the law as given you in charge by the Court."

I have carefully considered this subject. I have looked into all the cases that I can find, in which it is discussed, and the result is, that I have been induced, by the reasoning of Mr. Justice *Best,* in *Rex vs. Burdett,* (4 *Barn. & Ald.* 95,) and of

McGuffie *vs.* The State.

Judge *Kent*, in the case of *The People vs. Croswell*, (3 *John. Cas.* 337,) to modify the opinion I expressed on this point when the judgment was delivered; and I am now satisfied that in criminal cases, the Jury may be said to be judges of the law as well as of the facts, because the law gives to them the privilege of acquitting the prisoner, although the Judge may tell them, that according to law, if they find certain facts to be proven, he is guilty, and although they may find such facts to be proven; and this, their verdict, is final and conclusive.    In this sense, it is legal for them to find a verdict contrary to the charge, and I am constrained to agree with Judge *Kent*, in admitting that it cannot accurately be said that they would do wrong in exercising a privilege which, by law, is granted to them.    I am not prepared to say, consequently, that the Legislature has granted to them a lawful privilege, which is not a rightful power.

I defer, therefore, to the view of this subject taken by my brethren, and agree that they were right in holding that the Court below erred in restricting the Jury as he did on this point, to the law " as given them in charge by the Court." He might have called their attention to the fact, that the Judge, by his education and position, was better skilled in the law than themselves as the general rule, and might be looked to by them as a reliable and proper adviser; still, he should have added, that though, according to his view of the law, the prisoner might be guilty; yet, if they took a view of that law different from himself and deemed the prisoner innocent, they had the legal right so to find him.

[13.] The charge of the Court, in our opinion, was otherwise defective, and may have been prejudicial to the rights of the prisoner.

The Court instructed the Jury, among other things, that " if the prisoner raised and pointed the loaded gun at deceased, within a distance which the gun would carry, this act was an assault, and the deceased was justified in making resistance. That if the prisoner presented a loaded gun at the deceased,

within distance that the gun would carry, deceased was justified in throwing a brick-bat at the prisoner, and the throwing of said brick-bat cannot be urged as any mitigation of the prisoner's conduct in continuing the difficulty. If, in such case, the prisoner presented a loaded gun with evil intention, provided it was done with malice aforethought, and the deceased threw a brick-bat at him, and then the prisoner shot him, it is murder. Such a case shows that the prisoner begun the difficulty, and the deceased did no illegal act in throwing the brick-bat."

Taking this part of the charge as a whole, we are satisfied that it was of a character too much to limit the Jury in determining whether or not this crime was murder or voluntary manslaughter.

Mr. Loring, a witness for the State, testified that after the prisoner had presented his gun at the deceased, and had taken it down at the instance of some of the by-standers, the decedent said to him, " if you raise that gun again, I will throw a brick-bat at you, the prisoner raised his gun again, and deceased threw the brick-bat at him, and then deceased jumped over the hack" of bricks, &c. Again he says : " when prisoner first put the gun to his face, deceased was standing in the crowd ; when deceased threw the brick-bat at prisoner he jumped over the hack, and was in the act of picking up another brick, when prisoner walked round the end of the hack, fifteen or twenty feet, and shot him," &c.

Now let us suppose, that after the prisoner had presented his gun at the decedent, even though he had done so with malicious intent to shoot him, he had desisted at the instance of the by-standers, and would not again have pointed the same at decedent or have fired on him, if the latter had not said what he did, and had not thrown the brick-bat.

We will see from the above statement, that it was possible the prisoner might not again have presented his gun, but for what he may have regarded as the bantering words of the decedent, nor have fired at him, but for the throwing of the brick-bat. If so, the crime may have been no more than voluntary

manslaughter. This was clearly possible; and yet, the charge of the Court assumed, that if the prisoner had thus, in the outset, presented the gun with malicious intent, notwithstanding what followed, the killing was murder.

We mean to express no opinion upon the evidence. We do not wish to be understood as intimating that this crime did not amount to murder. We only desire to say, that it was the province of the Jury to determine this (they might possibly have found the same verdict, if the charge had been correct in this respect) and that they may have been prevented by the charge of the Court from giving due weight and consideration to circumstances, the effect of which, on their minds, might have been to show that the prisoner would not have fired on the decedent when he did, if he had not been provoked by the language and conduct of the former; and that it was possible they might have regarded the throwing of the brick-bat as such an assault as would have reduced the crime from murder to man-slaughter.

Let the judgment be reversed.