## Case No. 15,313.

UNITED STATES ex rel. HENDRICKS v. HARRIS.

[Atlanta Whig, June 13, 1872.]

Circuit Court, D. South Carolina, June 10, 1872.

HABEAS CORPUS—JURISDICTION OF FEDERAL COURTS—SERVICE OF PROCESS—REMOVAL OF OFFENDERS—ISSUE OF WARRANT—APPEAL.

[1. Under Act March 2, 1833, giving a judge of any district court of the United States power to grant writs of habeas corpus in all cases of a prisoner confined, by any authority, for any act done in pursuance of a law of the United States, or any order, process, or decree of any court thereof, one committed by a state court on charges of altering a bench warrant, attempting to kidnap, and false imprisonment,—all arising out of his arresting a person on process of a federal court which had been altered by insertion of the name of the person arrested,—may, on a proper showing, be released by a United States district judge.]

[Cited in Case of Electoral College, Case No. 4,336.]

[2. An officer will be protected in serving process regular on its face, issued by a court having jurisdiction of the subject-matter, though it issued irregularly.]

[3. A United States district judge, within whose district is an offender who has fled from the district in which his offense is triable, may issue a warrant for the arrest and transportation of the offender directly to the other district without his being first committed in the district where arrested.]

[4. The mere production of a bench warrant from the United States circuit court for one state by an officer thereof, to a United States district court in another state, is of itself sufficient on which to issue process to arrest, in the latter state, a person whose arrest is ordered by the bench warrant.]

[5. Appeal to the supreme court will not lie from the judgment of a United States district judge releasing, under Act March 2, 1833, on habeas corpus, a prisoner confined by a state court for an act done in pursuance of process of a federal court.]

[This was an application by H. W. Hendricks for a writ of habeas corpus, addressed to J. O. Harris, sheriff and jailer of Fulton county, Ga., under the act of March 2, 1833.]

Authorities referred to or cited by United States Attorney Farrow and L. J. Gartrell, for relator: Act March 2, 1833; 2 Abb. N. C. 265, 266, 269, 272; 2 Am. Law Reg. 150; Ex parte Robinson [Case No. 11,935]; Code, §§ 391, 4624, 462, 5; 3 Kelly, 2; 17 Ga. 498; 1 Hale, P. C. 460; [U. S. v. Arredondo] 6 Pet. [31 U. S.] 691; [Delassus v. U. S.] 9

26FED.CAS.—12

Pet. [34 U. S.] 117; [Strother v. Lucas] 12 Pet. [37 U. S.] 410; [Philadelphia & T. R. Co. v. Stimpson] 14 Pet. [39 U. S.] 448; [U. S. v. Price] 9 How. [50 U. S.] 89; [Minter v. Crommelin] 18 How. [59 U. S.] 87; 3 Grant, 406, 618, 13 Ill. 602; 30 Conn. 580; 15 La. 489; 34 Me. 210; 10 Fost. 318.

Authorities referred to or cited by Attorney General Hammond and L. B. Spencer, for respondent: Act March 2, 1833; Ex parte Robinson [Case No. 11,935]; 1 Brightly, U. S. Dig. 52, 302, 596; Spafford v. Goodell [Case No. 13,197]; Judicial Act, § 33; Conk. Prac. 582, 583, 599; 2 U. S. Dig. 487; 9 Ga. 535; Code, §§ 3947, 4630.

ERSKINE, District Judge. This suit is nominally between H. W. Hendricks and J. O. Harris, but in reality it is a proceeding between the United States and the state of Georgia. I am uninformed if it is not the first cause, under the act of March 2, 1833, that has been brought into this court, nor do I remember such a proceeding being before the circuit or district courts, or at chambers in the Southern district. So I think I may may safely say that it is primæ impressionis in Georgia. It has always been the anxious desire and the endeavor of this court that the state and national judiciaries should be in positive harmony with each other. This feeling has been reciprocated by the state superior court for the Atlanta circuit, over which presides a learned and just judge. The sheriff of that court, J. O. Harris, promptly obeyed the exigency of the suit of habeas corpus. The relator, in his petition (I give it in brief), stated that he was confined, without lawful right, in the jail of Fulton county, in this district, by James O. Harris, sheriff and jailer of said county, charged with crimes against the laws of the state of Georgia, when, in fact, he alleges he was confined for an act done in pursuance of a law of the United States & by virtue of a process of a judge or a court thereof, as a special deputy of the United States marshal for the district of Georgia. He prayed for a writ of habeas corpus, under the act of March 2, 1833. To his petition he appended a copy of a bench warrant issued from the United States circuit court for the district of South Carolina, which process was under the seal of said court, and signed by the clerk thereof; also, a copy of a process issued from the United States district court for the Southern district of Georgia, during the February term, 1872, tested in the name of the judge, signed by the clerk, and sealed with the seal of said court, which warrant was indorsed upon the bench warrant. The judge granted the writ of habeas corpus on the 18th of May, and made it returnable on the 22d, before the United States district court for the Northern district of Georgia. The writ was executed on the defendant, Harris, who brought the relator, Hendricks, before the court. Defend-

ant then asked for further time to perfect his return, and he was given until the 27th to do so. On the day named, he came with the relator into court, and made his return to the writ, which is as follows:

"State of Georgia, Fulton County. In obedience to the within writ, and by virtue of the same. I have taken the body of the within named H. W. Hendricks from the jail of said county, and have him in the city of Atlanta, in said county, before the district court of the United States for the Northern district of Georgia. And for the cause of his detention and imprisonment in said jail, I assign and state that on the ——— day of May, inst. the said H. W. Hendricks was arrested by A. M. Perkerson, deputy sheriff for said county, by virtue of a bench warrant issued by the Hon. J. L. Hopkins, judge of the superior court in and for said county, founded on a true bill of indictment by the grand jurors of said county charging the said Hendricks with the offense of 'falsely and fraudulently altering a bench warrant,' and, the said Hendricks failing to give bail when arrested, was, by the virtue of the warrant so issued by the Hon. J. L. Hopkins, committed to jail by the said A. M. Perkerson, deputy sheriff, a copy of which warrant, properly authenticated, is here produced. And I further state, for reason of the detention and imprisonment of the said H. W. Hendricks, that on the 20th day of May, inst., a bench warrant was issued by the Hon. J. L. Hopkins, judge of the superior court as aforesaid, for the arrest of the said H. W. Hendricks, said last-named warrant being based upon a true bill of indictment found by the grand jury of said county, charging the said Hendricks with the offense of 'an attempt to kidnap,' and by virtue of the said bench warrant, on the 20th inst., the same was executed, and said Hendricks held in custody thereby. The said second warrant was duly executed as above by W. D. Brown, deputy sheriff of Fulton county, a true and authentic copy of said warrant is here also produced. I further state that, on the 22d day of May, inst., a bench warrant for the arrest of the said H. W. Hendricks was issued by the Hon. J. L. Hopkins, judge of the superior court as aforesaid, based on a true bill of indictment found by the grand jurors of said superior court, in and for said county, charging the said Hendricks with the offense of false imprisonment, and by virtue of said bench warrant, issued by the said J. L. Hopkins as aforesaid, the same was, on the said 22d day of May, inst., executed by placing under arrest the said Hendricks, and confining him in the jail of said county, he failing to give bail in terms of the law. Said last-mentioned warrant was executed by W. D. Brown, deputy sheriff of Fulton county. A true and authentic copy of said warrant is here produced. I therefore assign these reasons as the causes of the detention and imprisonment of the said Hendricks in said jail; that is to say, three bench warrants issued by the Hon. J. L. Hopkins, judge of the superior court in and for said county and state, which were by the state's officers aforesaid executed by the arrest of the said H. W. Hendricks, and he, failing to give bail in the terms of the law, is held in custody to answer the charges of alleged violation of the state laws as above set forth. All of which is respectfully submitted, with copies of the bills of indictment upon which said bench warrants issued, duly authenticated. J. O. Harris, Sheriff and Jailer.

"Sworn to and subscribed before me, 24th May, 1872, in open court. W. B. Smith, Clerk."

The defendant annexed to his return copies of these bench warrants and the indictment found by the grand jury of Fulton superior court against the relator.

Courtesy required that notice should be given to the attorney general of the state of the pendency of these proceedings. This was done, and, at the request of Governor Smith, he and L. B. Spencer, were appointed on behalf of the defendant. The United States attorney and Lucius J. Gartrell argued the cause for the relator.

The following is a copy of the bench warrant issued—or purporting to have been issued—by the circuit court of the United States for South Carolina, and also of the warrant issued by the United States district court for the Southern district of Georgia, indorsed upon the bench warrant:

UNITED STATES OF AMERICA, } ss.
District of South Carolina.

Circuit Court.
April Term, 1872.

To Robt. M. Wallace, U. S. Marshal, or his Lawful Deputy:
Whereas a bill of indictment has been found against
           & Thomas Hancock
William Wessley Scott      for Conspiracy
           Joshuway Spears
under Acts of Congress.

These are therefore (by order of Court) to require you to seize, arrest, and bring before this Court, to be dealt with according to law, the said
       Wm. Wessley Scott &
       Thomas Hancock,
       Joshuway Spears.
By order of the Court, this 29th day of April, A. D. 1872.

         Dan. Horlbeck,
(SEAL        Clerk C. & D. C. U. States
U. S. Circuit      for South Carolina.
Court, Dist.
of So. Carolina.)

United States of America,      United States of America,
Southern Dist. of Georgia.      District of South Carolina.
                     Circuit Court.
H. W. Hendricks being the      April Term, 1872.
lawful deputy of the U. S.
Marshal for the Districts        The U. S. } War-
of South Carolina and                  rant of
presenting the within         vs. } Arrest
warrant in this District                to an-
alleging that said Defend-    Wm. Wessley Scott } swer for
ant is within the limits of    Thomas Hancock } Conspi-
Georgia, it is hereby       Joshuway Spears } racy.
ordered that William H.
Smyth the Marshal of the      Daniel Horlbeck,
District of Georgia do ex-      C. C. C. & D. C. U. S.
ecute the within warrant if        for So. Ca.
said defendants can be found
within the limits of Georgia,
and that he deliver said
defendant to the Marshal
of the Districts of South

Carolina, or his lawful
Deputy.
    Witness the Hon. John
Erskine, Judge of the U. S.
Dist. Court for the Districts
of Georgia, this 30 day of
April, A. D. 1872.
      James McPherson,
               Clerk.
(Seal of
District Court of Georgia.)

    I Hereby depute H. W.
Hendricks as my special
deputy to execute the within
warrant. Savannah, Ga.,
May, 1872.
Wm. H. Smyth, U. S.
      Marshal.

In justification of the acts done by the relator as a special deputy marshal, in pursuance of the process issued from the United States circuit court for South Carolina, and the process issued from the United States district court for the Southern district of Georgia, at Savannah, he put in evidence the papers just read. The process alleged to have been issued by the federal circuit court for South Carolina was inspected by the court, and, after argument by the respective counsel in the case, the court expressed the opinion that it could not, on the inspection of the paper, without more, determine whether the names of Thomas Hancock and Joshuway (sic) Spears, or either of them, was inserted in the warrant before or after it had received the seal of the court and left the hands of the clerk, or whether the names, or either of them, were inserted after the issuing of the process at Savannah. The court further said that, although the warrant contained on its face a cause of arrest, yet, as each of these names was, apparently, in a different handwriting, and the ink in each different, and also both inks obviously unlike that used in the body of the warrant and in the name of Wm. Wessley Scott, suspicion was cast upon the warrant, and its genuineness as an entirety rendered questionable,—apparently good as to Wm. Wessley Scott; suspicious as to Hancock and Spears. Therefore it was incumbent on the relator, who produced it in evidence, to explain by evidence the doubtful appearance. I may, however, here remark that I know of no rule or law which prohibits the inserting of one or more than one name, by interlineation or otherwise, in a warrant or other process, provided they are inserted at the proper time. Feeling the influence of the thought that a process for the apprehension of a man's person is an act of no unimportant character, and as no alteration can be rightfully made in it after it has finally left the hands of the judge or court, I acquainted the counsel on both sides that the court would, if they desired it, suspend the further hearing of the cause for a reasonable time, that testimony, by witnesses before the court, or by depositions, or by affidavits, could be produced. No request was made, and the cause proceeded.

W. H. Smyth, United States marshal, a witness sworn on the part of the relator, testified that he knew the relator, and appointed him a special deputy on the 1st of last May, in Savannah, Ga. There were 8 or 10 warrants to be executed in Georgia by him. Had now in his possession some of those warrants. Some have been executed and others are in the hands of deputies for execution. He had examined the warrants given him so far as to see that they had the authority of the district court of Georgia on them, only so far as the inside of the warrant was concerned. He had examined the printed form on one or two warrants, and saw that it was different from the form used in this state. While in Justice Butt's office, on the occasion of the arrest of the relator, he had examined other and similar warrants. His attention was directed to the indorsements made by Mr. McPherson, the clerk of the court in Savannah. There was a dissimilarity in the clerk's indorsements. He made this indorsement on each warrant, and handed them in a package to the relator. (Five warrants were tendered in evidence, and handed to witness. He found in the one on which Hancock was arrested three names,—Hancock, Scott, and Spears. In each of the two commissioners' warrants he found the name of one defendant and two witnesses.) He had seen the relator write. When he was bailed, he asked him to write to satisfy himself, without informing him of his object. Had afterwards compared this writing with the name interlined in the warrant. The only authority the relator had for acting as his deputy was the appointment on the warrants. Does not know whether he was sworn. He was not present when they were delivered to Mr. McPherson. He does not know the handwriting in the warrants; does not know Mr. Horlbeck's handwriting.

The attorney general for the state of Georgia offered the following writing, impressed with the seal of the federal circuit court for South Carolina and signed by the clerk, but not verified by oath, in evidence, in behalf of the defendant. It was read to the court without objection:

"Office United States Circuit Court for So. Ca.—ss: I, Daniel Horlbeck, clerk of said court, do hereby certify that no bill of indictment has been found against Thomas Hancock and no bench warrant has been issued against said Hancock. I further certify that a bench warrant was issued against Wm. Wessley Scott, and said warrant contained no other name. All the bench warrants issued from this office contained the name of but one individual against whom bill had been found.

"Witness my hand and seal of said court at Charleston, this 13th day of May, A. D. 1872.

"(Signed) Dan'l Horlbeck, C. C. C. U. S. for S. C.

"(Seal U. S. Circuit Court Dist. of South Carolina.)"

After the submission of this paper to the court, counsel for relator offered him as a witness in his own behalf, to rebut and overcome the testimony of Horlbeck, and to show that, if the warrant had been altered, he was innocent of the act, and of any knowledge by whom or when altered. Counsel relied on the act of July 6, 1862 (12 Stat. 588), which enacts that "the laws of the state in which the court is held shall be rules of decision as to the competency of witnesses in the courts of the United States. in trials at common law, in equity, and admiralty"; and also on the act of July 2, 1864 (13 Stat. 351), which declares that "in the courts of the United States there shall be no exclusion of any witness for account of color, nor in civil actions because he is a party, or interested in the issue tried."

Counsel for the defendant objected to the introduction of the relator himself. as contrary to all precedent and authority, in habeas corpus cases, and cited Com. v. Harrison, 11 Mass. 63. And. moreover, if allowed to testify, he might thus acquit himself of the crimes for which he stood indicted in the state court. The question was fully argued pro and con, and upon the court informing the learned counsel in the cause that it was ready to decide the question of competency, counsel for the relator said they would move to have the testimony of Horlbeck withdrawn; to which the court said, it would hear argument on that question. Here counsel on both sides conferred together, and it was agreed that the relator might testify.

One of the rights secured to the citizen by the fifth amendment of the constitution is that which declares that no person shall "be deprived of life, liberty, or property without due process of law." This essential safeguard of the people is deduced from its grand original. the twenty-ninth chapter of Magna Charta, which asserts and preserves, among other blessings. the personal liberty of individuals; and this guaranty contains the very essence of the writ of habeas corpus. Speaking of this writ, the supreme court of the nation, in Ex parte Watkins, 3 Pet. [28 U. S.] 193. said: "It is in the nature of a writ of error to examine the legality of the commitment. It brings the body of the prisoner up together with the cause of his commitment. The court can, undoubtedly, inquire into the sufficiency of that cause."

The fourteenth section of the judiciary act of 1789 gave authority to the federal courts and the judges thereof to "grant writs of habeas corpus for the purpose of an inquiry into the cause of commitment." But this act did not empower a court or judge to issue the writ to bring up a prisoner in custody under a sentence or execution of a state court for any other purpose than to be used as a witness. And it was not until the manifestation of what were known as the nullification theories. in a sister state, that another act was passed, having for its object, among other things, the protection of persons who might be prosecuted under assumed state or other authority for acts done under the laws of the United States. This law is commonly called the "Force Bill." The seventh section provides that "either of the justices of the supreme court, or a judge of any district court of the United States, in addition to the authority already conferred by law, shall have power to grant writs of habeas corpus in all cases of a prisoner or prisoners in jail or confinement. where he or they shall be committed or confined on or by any authority of law. for any act done or omitted to be done in pursuance of a law of the United States or any order process or decree of any judge or court thereof. anything in any act of congress to the contrary notwithstanding. And if any person or persons to whom such writ of habeas corpus may be directed shall refuse to obey the same. or shall neglect or refuse to make return, or shall make a false return thereto. in addition to the remedies already given by law. he or they shall be deemed and taken to be guilty of a misdemeanor. and shall. on conviction before any court of competent jurisdiction, be punished by a fine not exceeding one thousand dollars, and by imprisonment, not exceeding six months. or either. according to the nature and aggravation of the case." 4 Stat. 624. This act was construed and applied, on several occasions, by some of the most eminent judicial minds of their day,—by Mr. Justice Grier, Judge Kane, and Mr. Justice McLean; and recently a clear and thorough exposition of it has been given by the district judge for the district of Kentucky in the case of U. S. v. Jailer [Case No. 15.463].

Ex parte Jenkins [Case No. 7,259].—first case: Jenkins, a deputy marshal, accompanied by three others, having a process in his hands. attempted to arrest one Thomas, a fugitive from labor. A violent and bloody encounter ensued. and Thomas, being encouraged and assisted by numerous people of the neighborhood, effected his escape. By state authority. a warrant was issued against the marshals, who were arrested on the charge of "an assault with intent to kill." and imprisoned. A writ of habeas corpus was sued out, under the act of 1833, and Mr. Justice Grier discharged them. While commenting on the act of 1833. Judge Grier said: "The authority conferred on the judges of the United States by this act of congress gives them all the power that any other court could exercise under the writ of habeas corpus, or gives them none at all. If, under such a writ, they may not discharge the officer when imprisoned 'by any authority' for an act done in pursuance of a law of the United States, it would be impossible to discern for what useful purpose the act was passed." I will now advert to Ex parte Jenkins [supra].—third case,—to show that

this court is not restricted to the evidence which may be found among the records of the state court. Ex parte Jenkins [supra], —second case: Some time after the prisoners were discharged by Judge Grier, Thomas brought a civil suit against Jenkins and the other deputy marshals in the supreme court of Pennsylvania. A judge of that court allowed a capias ad respondendum, in trespass vi et armis, and with bail in the sum of $5.000 to issue, and under this writ the deputy marshals were arrested by the sheriff of Philadelphia county, and. not giving bail, committed to prison. On petition, Judge Kane awarded to them a writ of habeas corpus. The prisoners were brought into court, and, after argument had, discharged from custody. See Ex parte Robinson [Case No. 11,935], before Judge McLean at chambers. The deputy marshals had not been discharged very long before they were arrested a third time, by the sheriff, under a bench warrant of outlawry from the sessions court of Luzerne county, Pa., based on an indictment found by the grand jury. charging them with riot and assault with intent to kill; but the indictment did not set forth that the parties indicted were officers of the United States, nor that the alleged crimes had been committed while they were acting or professing to act under a law of the United States, or some order, process, or decree, or some court or judge thereof. In delivering the judgment in this case, Kane, J., said: "I can well imagine that the record in these cases would say nothing of the official character of the prisoner, or of his justification under the authority of the general government. If, then. the act of congress is to be made operative for the protection of the officer, he must be permitted to go behind and beyond the record under which he is confined. And if he could claim to do this. even after conviction, how much more clearly before? If not concluded by the result of a trial of which he had notice. and in which, perhaps, he took part, how much more clearly not by preliminary action of a committing magistrate, or the ex parte finding of a grand jury." And the learned judge says: "I must therefore proceed to hear the case on its merits, under the act of congress, and to that end must receive the evidence which is offered by the relator."

In connection with the foregoing I may add that, in U. S. v. Jailer [Case No. 15,463], when the writ of habeas corpus was granted by Ballard, J., the relator was confined in jail. under a commitment made by a state court; but, intermediate the commitment and hearing of his case by the United States circuit court, the grand jury of the state court returned a true bill of indictment against Roberts for murder. In giving the opinion of the court, the judge said: "By a long course of judicial decisions it may now be considered as settled that the act gives relief to one in state custody, not only when he is held under a law of the state which seeks expressly to punish him for executing a law or process of the United States, but also when he is in such custody under a general law of the state which applies to all persons equally, where it appears he is justified for the act done, because it was done in pursuance of a law of the United States or, of a process of a court or judge of the same.";

The three indictments found by the grand jury against the relator are, as already mentioned. annexed to the return. The first of; these was found on the 15th of May, 1872, and it charges the relator with falsely, fraudulently, and feloniously altering, in this county, on the 2d day of May, 1872, a bench warrant, which was in due form issued for the arrest of Wm. Wessley Scott, by inserting therein the names of Thomas Hancock and Joshuway Spears, with intent to defraud them of their liberty. A copy of the bench warrant from the United States circuit court, together with a copy of the process from the United States district court, at Savannah, and the appointment of the. relator as a special, deputy, is incorporated in the bill of indictment, and the indictment alleges that it is this "the said bench warrant" which the relator falsely and fraudulently altered and. changed for the purpose of defrauding Hancock and Spears of their liberty. The second indictment, found true on the 20th of May. charges the relator with arresting and imprisoning Hancock without authority of law. Both the learned counsel for the state said that, if the court should be satisfied that the relator was a lawful deputy marshal. and had a valid warrant against Hancock, when he arrested him, on the 4th day of May, then, as to the indictments for false imprisonment and attempt to kidnap, he ought to be discharged. But with some plausibility they argued that the alteration of the bench warrant, by inserting the name of Hancock in it, could not be an act done in obedience to process issued by a federal court: also, that this act of altering was no part of the arrest of Hancock, for it was done on a different day, and for the alteration of the court must remand him, though it discharged him for the other alleged offenses against the state.

The learned counsel assumed the fact that the relator did make the alteration in the bench warrant. It was proved by the evidence before the court that the relator arrested Hancock on Saturday, the 4th of May, and the alteration is alleged, in the indictment, to have been made by the relator on the 2d day of May. Although, on a trial of this indictment. the proof may show that the alteration was made at a time prior or subsequent to the 2d day of May, still a court, in looking to the record alone. always assumes the time there stated to be the true time. Now. from the argument of the learned counsel. it must fairly follow. as a logical consequence. that, if the relator made the altera-.

tion in the bench warrant, he did so before he arrested Hancock. Therefore he could not have had a legal process when he did arrest him. I here pause to remark that, during the hearing of this case, the attorney general for the state and his associate with becoming ingenuousness, were alike anxious, with the counsel for the United States, that the recondite causes of the imprisonment of the relator should be-brought to view.

, I have already spoken of the introduction of the evidence on the part of the relator and defendant respectively. William H. Smyth, United States marshal for Georgia, being sworn, stated that he had examined the warrants only so far as the inside was concerned, and saw that it was different from the form used in this state; only authority relator had for acting was that made by witness on each warrant: had compared relator's handwriting with the interlineations in the bench warrant; don't know handwriting in the bench warrant, nor Mr. Horlbeck's handwriting; don't know whether relator was sworn or not. The testimony of Mr. Horlbeck,—introduced by defendant: "There was no indictment against Thomas Hancock, nor had any bench warrant issued against him. There was a bench warrant against Wm. Wessley Scott, but it contained no other name, nor do bench warrants, issued from that office, contain more than one name." Such is the substance of the evidence of these two witnesses. Their evidence may be found in full supra. I find, on reading the evidence of the relator, given viva voce, in open court, that a synopsis of it cannot be made so as to preserve the substance of it. I therefore give it in full: H. W. Hendricks, being sworn, testified as follows:

"I have been acting as deputy marshal in the state of South Carolina about four months, under the appointment already read in evidence. (Warrant was here handed the witness, issued from the circuit court of South Carolina.) I had nothing whatever to do with the insertion of the names of Thomas Hancock and Joshuway Spears in the warrant handed me. I arrested Thomas Hancock in Kiser's store, in Atlanta. I was taken there by a man named Williams. I obtained the warrant from Williams. Williams first went into the store, came out again, handed me the warrant, and told me the man was in the store, and to go in and arrest him. I told him he must go in and point out the man. This was on Saturday two weeks ago. I got the warrant first in the city of Charleston from Maj. Stone, who was assistant district attorney. Williams was present at the time. Maj. Stone handed me eight or ten warrants. He took out one, said Williams did not want that. I was directed to act under Williams' instructions. I took the warrants to the marshal's office, and showed them to the marshal. I had between seven and eight. I was directed to take them to Savannah. I did so,—sent them

in to the clerk's office from the marshal's office. I got them again the next day. Maj. Smyth, the marshal, delivered them to me. I took them to the hotel, put them in my valise, and took the night train for Macon. I found Mr. Williams at the train at Atlanta.—met him there. I had not arrested any one before I met Williams. After meeting Williams, I went with him over to the American Hotel. opened my valise, took out the warrants, and handed them to Williams. He said he knew every one of those men. He then said he must start immediately for Marietta. We took the 4 o'clock train and went to his uncle Whitlock's, near Marietta, arrested his cousin, went afterwards to his (Williams') brother. I returned to Atlanta next morning; got up at about 8 o'clock. After breakfast, Williams said. 'Now, let us go and get Hancock,' took me to Kiser's store, went into the store, returned after a few minutes, told me the man was in the store, and to go in and arrest him. I told him he must go in and point him out. He did so. I arrested Hancock, and told him to come with me to the marshal's office. He did so, and I turned him over to a deputy marshal in the office. I left him in his charge, and had nothing more to do with him. This was on Saturday. I was arrested on the Thursday following, four or five days after. After Maj. Smyth went my security for the false imprisonment case, and Col. Alston had dismissed the forgery case. I was arrested on the bench warrant, and have been in jail ever since. I knew nothing of the insertion of the names in the warrant: had nothing to do with it: knew nothing whatever of. Hancock until about 8 o'clock that morning, when. Williams called on me to make the arrest. I knew nothing at all about the insertion of the names in the warrant. nor had I anything to do with it, nor do I know who inserted them, when it was done, or anything about it." Cross-examined: "I reside in South Carolina. Know nothing of Williams except that I saw him about the courts. Williams resides in the upper part of South Carolina. I do not know the handwriting in the warrant, nor the handwriting of either of the names. I had not, to my knowledge, any other bench warrant with more than one name When Williams took the warrants at the hotel in Atlanta. I do not know whether the two additional names were in the warrant in question or not. I do not know whether they were there before the indorsement by McPherson. the clerk, or not." Direct examination resumed: "I did not examine any of the warrants to see whether they had more than one name in them or not. I did not have time."

When I read the section of the law under which this writ of habeas corpus was issued. and consider the uniform interpretation given to it by the national courts, must I close my eyes to the light of judicial reason which surrounds me? If the court cannot

inquire into the real history of the cause of the imprisonment of the relator; if it cannot invoke the evidence given before the court itself, whenever essential to the ends of justice, through the law, go behind this series of indictments to ascertain whether they had their origin and birth in one cause and flow from a single and not from a triple course; if the court is restricted to the inspection of the bench warrants and the indictments, as they formally appear, for all the evidential knowledge upon which it is to act, and to give judgment whether the relator is justified or not,—then the sending forth of the writ, and the bringing of the prisoner before the court, merely to remand him, or virtually to deny to him, when here, the full benefit of the law of habeas corpus, which commands the court or judge to search into the cause of the commitment, would be a ridiculous pageant and mockery of justice. And, notwithstanding the statement of Mr. Horlbeck—for this paper (copied supra) was tendered in evidence by the defendant, and, unopposed by the relator, read to and received as evidence by the court—that the bench warrant, when issued, contained no other name than that of Wm. Wessley Scott, nevertheless, if the sworn testimony of the relator is to be believed, and no part of his evidence was or is objected to (his competency as a witness in this cause was admitted by, or at least met the distinct and positive acquiescence of, the defendant), then he did not insert the names of Thomas Hancock and Joshuway Spears, or either name, in the bench warrant, nor had any knowledge by whom, where, or when interpolated. Therefore the court, under the testimony produced before it, cannot do otherwise than to hold that the relator has dispelled the cloud of suspicion that rested upon him when he offered the bench warrant in evidence. It is true, however, that it is by his own testimony that he relieved himself from suspicion; but his truthfulness was not questioned by the defendant, nor was there any evidence offered to overthrow it. In coming to this conclusion, I have not been unmindful of what Mr. Horlbeck, the clerk, stated,—and stated truly, I have every reason to believe,—that neither the name of Thomas Hancock nor Joshuway Spears was in the bench warrant when it was issued from his office.

On the subject of the jurisdiction of the state court to try Hendricks for the alleged alteration of the bench warrant issued from the federal circuit court for South Carolina, I would remark that this court would be departing from its proper sphere of action if it assumed, in a habeas corpus case, to examine whether the state court could take cognizance of that or any other particular case. Indeed, the question is wholly irrelevant here. For whether the interpolation of names into that bench warrant is an offense against the state of Georgia, her courts alone can determine. I may add, the state courts cannot hold jurisdiction over offenses exclusively existing as offenses against the United States. Every criminal presentation must charge the offense as having been committed against the sovereign whose courts sit in judgment on the offender, and whose executive may pardon him. The jurisdiction of the national courts is limited, but within its limits supreme. And the constitution of the United States, and all acts of congress made pursuant thereof, are the supreme law of the land, binding on the conscience of state judges as well as those of the United States.

In respect to the "writing" on the back of the bench warrant, the learned attorney general contended (1) that it was not issued by the judge, but by the clerk, and without the judge's knowledge, and without authority of law; (2) had the process been good in South Carolina against Hancock, it could not, with that indorsement, be executed in Georgia (the fugitive must be committed, and then the judge must order his removal); and (3) that no commitment can be had except upon warrant issued upon oath, and upon evidence delivered under oath,—citing Conk. Prac. 582, 583, 599; Judicial Act, § 33 [1 Stat. 91]. A copy of the South Carolina warrant and the process issued at Savannah may be found supra. It will be seen that I have divided the proposition advanced by the attorney general into three clauses. To the first: It is doubtless true, as stated, that this writing was issued by the clerk, and not by the judge, or with his knowledge. But, nevertheless, it shows upon its face that it was issued during a session or stated term of the court, tested in the name of the judge, sealed with the seal of the court, and signed by the clerk. These indicia being patent on the paper, the presumption of law is that it is a judicial process, and issued by the court whose test and seal it bears. Besides, if it was necessary to the validity of a process that the judge, sitting as a court, must make an order, or have knowledge of its being issued by the clerk, still there is no evidence whatever that the marshal was cognizant at any time of the manner in which it was issued. Neither is there any evidence that the relator, when appointed special deputy or afterwards, knew how it was issued. It is a recognized principle of law, applicable to this case, that when the court has jurisdiction of the subject-matter, or of similar subject-matter, the officer is not bound to examine into the validity of its proceedings or the regularity of its process, and is not liable,—certainly not without express malice. See Warner v. Shed, 10 Johns. 138; Dynes v. Hoover, 20 How. 65; Case of the Marshalsea, 10 Coke, 60, 68. And it has been held sufficient justification if a process is regular and legal on its face, though the officer has knowledge of facts rendering it void for want of jurisdiction. People v. Warren, 5 Hill, 440; Billings v. Russell, 23 Pa. St. 189. And see Code, § 294. In Keniston v. Little, 30 N. H. 318, which was an action for taking certain cattle of the de-

fendant, the court said: "If the process here did issue either erroneously or irregularly, the court having jurisdiction. it is not void, but is at most voidable. If erroneous, a party even may justify, under it. whatever was done by virtue of it while it was in force; and; if irregular, it is a justification for the party till set aside. Much more must it be so in the case of an officer." And Mr. Bishop, in his learned and accurate work on. Criminal Procedure (volume 1, § 187, 2d Ed.), says: "If a warrant in due form is put into the hands of an officer to whom it is addressed. he is justified in executing it, if the magistrate who issued it had jurisdiction over the cause, even though it was improperly or unlawfully obtained." And see Boyd v. State. 17 Ga. 194. And he will be protected in executing a warrant, although he knew at the time it was obtained for an undue purpose. State v. Weed, 1 Fost. (N H.) 262.

The gist of the second clause is this: Hancock, escaping from South Carolina to this state. must first be committed here, and afterwards the judge must order his removal. Provision is made by the thirty-third section of the judiciary act for the removal of offenders who have fled from one district to another; and if such commitment of the offender shall be in a district other than that in which the offense is to be tried, it shall be the duty of the judge of the district where the delinquent is imprisoned, reasonably to issue. and the marshal of the same district to execute, a warrant for the removal of the offender to the district in which the trial is to be had. In the case under consideration, the marshal is commanded "to execute the within warrant if said defendants can be found within the limits of Georgia, and that he deliver said defendant to the marshal of the district of South Carolina or his lawful deputy." It does not order him to commit them. True, the act speaks only of persons under "commitment." But does it make this imperative? Conkling (page 583) says that "it may doubtless be construed to warrant a removal without the formality of a previous commitment to prison, the form of the warrant being varied accordingly." In this case the views of that distinguished writer seem to have been substantially followed. Why commit him if the act does not make it obligatory to do so? When the person is arrested he may demand it as a right to be forthwith taken before the district judge, that the fact of his identity may be inquired into, and also bailed, if a bailable offense. He is entitled to an examination before he is removed to a distant state. See thirty-third section of judiciary act (1 Stat. 91). and remarks of Love, J.. and of Mr. Justice Miller, in Re Bailey [Case No. 730]. "In some districts." says Murray (U. S. Proceedings. 30), "the judge issues his warrant for the arrest and transportation of the prisoner directly to the district wherein the offense was committed, without requiring the production of the body before him." A precedent is of file in this court, dated May 16, 1872, issued in the city of Jefferson. Western district of Missouri, tested in the name of the district judge, the Honorable Arnold Krekel, sealed with the seal of the court, and signed by the clerk, which I may perhaps refer to again.

The third and last clause is that no commitment can be had except upon warrant issued under oath. and upon evidence delivered under oath. Observing the process issued at Savannah. it will be seen that it does not appear to be issued on the oath of any person. The bench warrant issued by the United States circuit court for South Carolina, recited that, "whereas a bill of indictment has been found against Wm. Wessley Scott, Thomas Hancock (interlined) and Joshuway Spears (interlined) for conspiracy under acts of congress. These are." etc. The process issued at Savannah recites that "H. W. Hendricks being the lawful deputy of the U. S. marshal for the Districts of South Carolina and presenting the within warrant in this district alleging that said defendant is within the limits of Georgia. it is hereby ordered that William H. Smyth the marshal of the Districts of Georgia do execute the within warrant if the defendants can be found," etc. Here the point is presented whether the mere production of the bench warrant from the United States circuit court for South Carolina. by an officer of that court, to a United States district court in Georgia. was of itself sufficient upon which to issue a process to arrest Hancock in Georgia. This is a matter of prime vitality. and I have carefully considered it, but without the privilege of looking into the writings of some authors who, perhaps, cast light upon the subject. It has however, received the attention of Judge Conkling. in his treatise (page 581). He says: "It sometimes happens that a person indicted in one district makes his escape before arrest into another district. In such cases the exhibition of a copy of the indictment, authenticated by the certificate of the clerk under the seal of the court. would. it is supposed. be the proper evidence. Perhaps, also, an affidavit, or the certificate of the clerk alone, that an indictment had been found. would be sufficient. as in England. See 1 Chit. Cr. Law. p. 342. But where the application is founded on the fact of an indictment alone. there ought. on the arrest of the suspected party, to be evidence of his identity. to warrant a commitment." If the rule laid down by Conkling is correct.— and no authority has come to my notice questioning it, —this case is still stronger; for the bench warrant from South Carolina. issued "by order of the court." under its seal. and signed by its clerk, states that a bill of indictment had been found, etc. And it was solely on the presentation of a bench warrant, issued by this court. stating that an indictment had been found against one W. Scott Thomas, etc., that the district court for the Western

district of Missouri granted a warrant for his arrest and removal. I am of the opinion that the views presented by the attorney general on this branch of the case are untenable.

It was insisted by the learned attorney general that the relator had no authority, except that conferred on him by the marshal, who specially deputed him to execute eight or ten warrants, and having taken no oath of office in this state, he was, therefore, not an officer of the United States, and so could not execute the warrant. The appointment is this: "I hereby depute H. W. Hendricks as my special deputy to execute the within warrant. (Signed) W. H. Smyth, U. S. Marshal." The twenty-seventh section of the act of 1789 (1 Stat. 72), after speaking of the appointment and removal of marshals, says: He shall have power "to appoint as there shall be occasion one or more deputies, who shall be removable from office by the judge of the district court, or the circuit court sitting within the district, at the pleasure of either; * . * * and the marshal shall take before said judge, as shall also his deputies, before they enter on the duties of their appointment, the following oath of office." And the seventh section of the act of July 29, 1861 (12 Stat. 282), declares that the marshals of the several districts "shall have the same powers in executing the laws of the United States, as sheriffs * * * in the several states, have by law, in executing the laws of the respective states." Ballard, J., in U. S. v. Jailer, supra, said: "The authority to appoint a special bailiff to execute a particular process, is recognized by all the authorities as appertaining to the sheriff." Conk. Prac. p. 319, says: "The service may be made by the marshal, by a general deputy, or by a special deputy or bailiff, constituted for that purpose." This is the practice in England, and I learn that it is the common practice throughout the Union. Indeed, it is authorized by the act of congress just quoted (and which is but a copy of the act of February 28, 1795); for it expressly gives to the marshals the same powers, in executing the laws of the United States, as sheriffs in the several states have. The relator was specially deputed in writing. In this state, a deputy sheriff may be appointed by parol. So even a deputy sheriff may appoint a bailiff to do a particular act. Matthis v. Pollard, 3 Kelly. 1; McGuffie v. State, 17 Ga. 497. But the point in the argument most strenuously insisted on was that the relator had taken no oath of office in this state, and therefore he was not an officer of the United States; so could not execute this warrant. There is no evidence before the court whether he was sworn or not. The marshal testified that he "did not know whether he was sworn." The relator was not asked whether he had taken the oath. When the marshal appointed him a special deputy, and he accepted the appointment, this instated him; and the law will presume

that he complied with all its requirements before acting. In the case of U. S. v. Batchelder [Case No. 14,490], Mr. Justice Story said: "If an officer of the customs be duly commissioned, and be found acting in the duties of his office, the law presumes that he has taken the regular oaths until the contrary appears."

The court is of the opinion that the writ must be upheld, and, on payment of costs, the prisoner is discharged.

When the court announced its judgment discharging the prisoner, the attorney general of the state asked for an appeal to the supreme court of the United States, and that the relator give bail for his forthcoming should the judgment of this court be reversed. To-day the matter was heard, and the court decided that, under the act of 1833, no appeal lay in this case.